UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REZA AHMED HASHEMI,

               Plaintiff,                       Case No. 4:14-cv-11578
                                               District Judge Linda V. Parker
v.                                       Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 24) AND TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 18)**

I.     **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment, **DENY** Plaintiff's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

II.    **REPORT**

     Plaintiff, Reza Ahmed Hashemi, brings this action under 42 U.S.C. §§

405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security  ("Commissioner") denying his applications for social security disability

insurance benefits and supplemental security income.  This matter is before the

United States Magistrate Judge for a Report and Recommendation on Plaintiff's

motion for summary judgment (DE 18), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 24), and the administrative record (DE 13).

### A.   Background

Plaintiff protectively filed his applications for benefits on December 3, 2008, alleging that he has been disabled since March 30, 2008.[1]  (R. at 215 and 224.) Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Jack D. McCarthy held a hearing on July 21, 2010 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 71-119.)  On August 3, 2012, the Appeals Council denied Plaintiff's request for review.  (R. at 1.)  Plaintiff then forwarded additional evidence to the Appeals Counsel, which determined on April 9, 2014 that there was no reason to re-open and change the decision.  (Id.)  ALJ McCarthy's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

---

[1] Plaintiff initially indicated that her alleged onset date was December 7, 2007.  (R. at 207.)  At the hearing, however, Plaintiff and his counsel amended the alleged onset date to March 30, 2008, because Plaintiff was working until that date.  (R. at 93.)

### B.      Plaintiff's Medical History

Plaintiff, who was 23 years old at the time, presented to the North Kansas City Hospital Emergency Department on July 4, 2007, with complaints of vomiting, fever, dizziness, spinning, and feeling off balance.  (R. at 480-486.)   He underwent a CT scan, which revealed "focal patchy areas" that were "unusual for a patient of his age" and which raised "the question of a demyelinating process."  (R. at 486.)  Following his emergency room visit, Plaintiff was seen by Dr. Emran Rouf, who reviewed Plaintiff's MRI and noted that he strongly suspected multiple sclerosis ("MS") as a diagnosis.  (R. at 534.)  He further noted that Plaintiff was only able to recall two out of three objects.  (R. at 533.)

Neurologist Daryl Thompson, M.D., diagnosed Plaintiff with multiple sclerosis on August 8, 2007.  (R. at 523.)  During his treatment with Dr. Thompson, Plaintiff underwent a second brain MRI on August 30, 2007, which showed no significant changes from his previous test.  (R. at 526.)  On September 4, 2007, Dr. Thompson started Plaintiff on Rebif.  (R. at 500.)  On December 4, 2007, Dr. Thompson performed a neurological examination on Plaintiff and reported the results as normal.  (R. at 497.)  On March 13, 2008, Dr. Thompson indicated that Plaintiff's MS was "relapsing/ remitting" and that he had memory impairment secondary to his MS.  (R. at 498.)  He further noted that Plaintiff's neurological examination was normal and his mini mental status examination

("MMSE") score was 27 out of 30.  (R. at 511.)  At his next visit, on August 25, 2008, Plaintiff's MMSE score was 29 out of 30.  (R. at 569.)

Plaintiff underwent an MRI on September 2, 2008, which revealed multiple nonenhancing foci, consistent with a history of MS and an "overall mild lesion burden."  (R. at 591.)  Plaintiff underwent additional MRIs on January 24, 2009 (R. at 773-74) and December 28, 2009 (R. at 722-23). Each revealed little to no changes from the previous MRI, but continued to confirm a diagnosis of MS. On April 1, 2010, Plaintiff's neurological examination was reported as normal.  (R. at 681.)  Plaintiff's April 25, 2010 MRI revealed "no appreciable change in multiple T2" and no new lesions.  (R. at 669-70).

Plaintiff began mental health treatment with psychiatrist Dr.  Shazin Khan on December 14, 2008.  (R. at 655.)   Dr. Khan diagnosed Plaintiff with Post Traumatic Stress Disorder ("PTSD") and major depressive disorder, and began Plaintiff on Cymbalta.  (R. at 792.)   Dr. Khan indicated that as of March 1, 2010, Plaintiff's global assessment functioning score was 60-65.[2]  (R. at 799.)

---

[2] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  A GAF Score of 61-70 is indicative of some

Plaintiff underwent an examination by consultative examiner John J. Sand, M.D., on August 11, 2010.  (R. at 810.)  Dr. Sand noted that Plaintiff had a loss of vibration sensation all over and a slow gait.  (Id.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the July 21, 2010 hearing, Plaintiff testified that he was a 26 year-old Iraqi-born man who immigrated to the United States around twelve years ago.  (R. at 92 and 113.)  At the time of the hearing, he lived with his wife and then-newborn daughter in Missouri.[3]  (R. at 102 and 117.)  The last grade he completed was tenth grade and he did not obtain a GED.  (R. at 92-93.)  Plaintiff testified that he had last worked in March 2008 at the Budget Car and Truck Rental.  According to Plaintiff, he left that job because of his memory problems.  Specifically, he testified that he had trouble remembering instructions and would forget which vehicles were classified as compact, mid-size, full-size, and luxury, which resulted in his losing the company money.  (R. at 105.)  Plaintiff testified that he also worked at the Assurant Company, but could not manage his time and took too many sick days.  (R. at 94.)  Plaintiff testified that in 2005-2006, he worked as an

mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well.  DSM-IV-TR at 34.

[3] Plaintiff apparently moved to the Detroit area sometime in 2014, prior to filing the instant action.  (*See*, e.g., R. at 6-7.)

Arabic and Persian translator for the United States Air Force, but eventually became too ill to continue.  (R. at 95.)

Plaintiff testified that he was diagnosed with MS.  (R. at 100.)  He averred that sometimes he has flare-ups, which make his symptoms worse.  He testified that when he has flare-ups, he also has anxiety, which is helped slightly by his three weekly injections of Interferon.  (R. at 106.)  Plaintiff testified that during the flare-ups, he usually has pain in his foot, his neck, or as a migraine headache.  (R. at 101.)  He testified that he also gets numbness in his feet and tingling and shaking in his fingers, and experiences significant amounts of weakness.  Plaintiff gave an example of how he has trouble shopping with his wife because he cannot lift the shopping bags.  (R. at 103.)  He testified that he uses a cane because he falls often at home and in public.  (R. at 104.)  According to Plaintiff, stress makes his condition worse.  (R. at 102.)

Plaintiff testified that he is also being treated for mental health issues, including depression, anxiety, and PTSD.  (R. at 106 and 111.)  Plaintiff testified that his mental health issues cause him to panic and consider suicide, but his religion does not allow suicide.  (R. at 111-12.)  Plaintiff testified that he does not want to leave his house and has nightmares about bombings he lived through when he was a child in Iraq.  (R. at 113.)

### 2.    Medical Expert Dr. Karsh's Testimony

Dr. Karsh, a State Agency medical expert who testified by phone, averred that he had never treated or examined Plaintiff, that he was familiar with the regulations defining the Listing of impairments, and that other than the letter requesting his testimony, he had had no communication with the ALJ about the case.  (R. at 107.)  The ALJ then asked Dr. Karsh to summarize what the records said about Plaintiff's impairments.  Dr. Karsh testified that Plaintiff's major impairment was his MS.  (R. at 108.)  He reviewed Dr. Thompson's June 23, 2010 statement that Plaintiff was disabled because of the MS, but compared it to Dr. Thomson's January 7, 2009 statement that Plaintiff's MS was under control and his neurological examination was normal.  (R. at 108.)  Dr. Karsh further noted that "none of the other neurologists have commented" on what Dr. Thompson refers to as Plaintiff's "significant reproducible fatigue [and] motor function with substantial muscle weakness on repetitive activity."  (Id.)  He pointed to other neurologists' findings that Plaintiff has no ataxia, dysmetria, or gait problems, and normal reflexes.  Dr. Karsh noted that it was possible that Plaintiff's "disabling feature" appeared after his 2009 examination, and indicated that it could have occurred because Plaintiff's MS was relapsing/remitting.  (R. at 109.)  Dr. Karsh concluded that Plaintiff's impairment or combination of impairments did not meet the criteria for Listing 11.09, or any other Listings.  (R. at 110.)

### 3.   Vocational Expert Testimony

Amy Salva testified as the Vocational Expert ("VE") at the July 21, 2010 administrative hearing.  (R. at 114-119.)  The VE testified that Plaintiff's past relevant work was as a car rental clerk, interpreter, donut maker, laborer, and cashier.  (R. at 115.) The ALJ asked the VE to determine if a hypothetical person of Plaintiff's age, educational background, and work experience could perform his past relevant work with the following limitations:

> [T]his person can lift/carry up to 50 pounds occasionally, 25 pounds frequently.  This person can stand/walk 6 of 8 hours, sit 2 of 8, excuse me, 6 of 8 hours.  This person should avoid unprotected heights and dangerous machinery.  This person should avoid hazards that could cause injury in case of a fall.

(R. at 116.)   Based on this hypothetical, the VE testified that the hypothetical individual could perform the positions of cashier, translator, and an indoor car rental clerk position (40% of rental clerk positions).  The ALJ then modified his hypothetical to add the limitation that the hypothetical individual was "able to understand, remember[,] and carry out simple instructions.  (Id.)   The VE testified that the hypothetical individual could perform the cashier position.  In addition, the VE testified that the hypothetical individual could perform the position of order filler at the medium exertional level, with 7,000 positions in the state of Missouri and 280,000 nationally.  (R. at 117.)  At the light exertional level, the hypothetical individual could perform the positions of finishing machine operator, with 1,000

positions in the state of Missouri and 61,000 positions nationally, electronics sub-

assembler, with 4,000 positions in the state of Missouri and 90,000 nationally, and

the position of bench assembler, with 8,000 positions in the state of Missouri and

340,000 positions nationally. (R. at 118.) At the sedentary level, the hypothetical

individual could perform the position of document scanner, with 2,000 positions in

the state of Missouri and 140,000 nationally.

Plaintiff's attorney then questioned the VE. In answer to his question, the

VE testified that a hypothetical individual who misses two or three days per month

could not sustain competitive employment. (R. at 118.) Nor could a hypothetical

person who needs one or two unscheduled breaks on a consistent basis, if that

individual needs more than fifteen extra minutes per day. (R. at 119.)

## D.  THE ADMINISTRATIVE DECISION

On March 9, 2011, the ALJ issued his decision. (R. at 71-84.) At step one

of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the  review, *see Colvin v.
Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential
review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet
    or equal the criteria of an impairment set forth in the Commissioner's
    Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

in substantially gainful activity since July 8, 2008.  (R. at 74.)  At step two, the

ALJ found that Plaintiff had the following severe impairments: MS, reduced left-

eye visual acuity, major depressive disorder, and PTSD.  (Id.)

At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 74-

75.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual

functional capacity ("RFC")[3] and determined that Plaintiff can perform light work

with:

> [N]o limitation on sitting but he is limited to standing/walking two
> hours in an eight-hour workday.  He can occasionally use foot pedals
> with the left foot, climb ramps and stairs, balance[,] and operate a
> motor vehicle.  He should avoid climbing ladders, ropes and scaffolds,
> unprotected heights and dangerous machinery.  He is able to follow
> simple and low level detailed instructions, i.e., unskilled and

---

4.   Considering the claimant's residual functional capacity, can the
      claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and
      residual functional capacity, can the claimant perform other work
      available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).
[3] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th
Cir. 2002).

> semiskilled instructions.  He can have only superficial interaction with the public.  He can maintain routine interaction with supervisors and co-workers, but should avoid working as a team member.

(R. at 75.)  Relying on the VE's testimony, the ALJ determined that Plaintiff was unable to perform his past relevant work, but concluded that he was capable of performing other jobs that exists in significant numbers in the state and national economy.  (R. at 83.)   He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (Id.)

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

11

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.  ANALYSIS

In his motion for summary judgment, Plaintiff asserts that the ALJ erred in assessing his RFC in three ways.  First, Plaintiff argues that the ALJ improperly discounted Plaintiff's credibility.  Second, he contends that the ALJ did not properly weigh the opinion evidence because he discounted the opinions of Plaintiff's treating physicians.  Finally, he argues that the ALJ failed to include Plaintiff's memory problems in his hypothetical to the VE.  The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial evidence supports the ALJ's conclusions.  The Undersigned agrees with the Commissioner's assertion and will address each argument in turn.

### 1.    The ALJ Did Not Err in the Credibility Assessment

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008).  Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters,* 127 F.3d at 531.

13

When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 82.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p. A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .") (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,

14

508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently

specific explanation for his [or her] credibility determination so that it is clear to

the individual and any subsequent reviewers the weight given to the individual's

statements and the reasons for that weight."  *Malcom v. Comm'r of Soc. Sec.*, No.

13-15188, 2015 WL 1539711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec.

Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, Plaintiff asserts that the ALJ erred by 1) placing emphasis on

Plaintiff's failure to take his medicine during two different timeframes and 2) by

"cherry picking" evidence and giving short shrift to the waxing and waning nature

of Plaintiff's MS.

### a.      Plaintiff's Failure to Follow the Prescribed Treatment

Plaintiff's first argument is without merit.  "The Sixth Circuit recognizes

that a claimant's failure to follow prescribed treatment is evidence supporting an

ALJ's factual finding that the claimant's testimony was not fully credible."  *Lemle

v. Comm'r of Soc. Sec.*, No. Civ.A. 11-10295, 2012 WL 1060111, at *9 (E.D.

Mich. Jan. 27, 2012) *report and recommendation adopted*, No. 11-10295, 2012

WL 1069787 (E.D. Mich. Mar. 29, 2012) (citing *Sias v. Sec'y of Health & Hum.

Servs.*, 861 F.2d 475, 480 (6th Cir. 1988)); *see also* S.S.R. 96-7p, 1996 WL

374186, at *8 (noting that "the individual's statements may be less credible if . . .

the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

In the instant case, the ALJ concluded that Plaintiff was not entirely credible for a number of reasons, including the fact that his "ability to travel long distances and for extended periods of time without treatments for his impairments [was] not consistent with his allegations regarding the severity of his symptoms." (R. at 78.) Evidence in the record supports the fact that Plaintiff did not take his medication for one week when he flew to Michigan (R. at 498) and for two months when he flew to Turkey to bring back his wife (R. at 568). Plaintiff does not provide any good reasons for his failure to take his medication during the described time periods. Accordingly, the ALJ did not err in considering Plaintiff's periods of noncompliance as one factor in his credibility determination.

### b.    The Progression of Plaintiff's MS

Plaintiff's second argument is also unavailing. Plaintiff asserts that the ALJ erred by misinterpreting the objective evidence. Specifically, he argues that the ALJ "appears to think that each of [Plaintiff's] brain MRI studies should show a 'worsening' and/or additional lesions." (DE 18 at 17.) However, there is no indication that the ALJ believed such a showing was required. Instead, the ALJ carefully explained that while Plaintiff has been diagnosed with MS, the bulk of his neurological examinations have been normal and were largely unchanged from

16

each of the prior results, and therefore Plaintiff's subjective limitations were not corroborated in the objective evidence. (R. at 77-78.)  This conclusion is supported by the record. (R. at 569, 681, and 722.)

As support for his position, Plaintiff notes that he had six brain MRIs, a lumbar puncture, and an EEG "all of which were abnormal and confirmed the diagnosis of . . . multiple sclerosis." (DE 18 at 18.)  But there is no denial of these findings or this diagnosis by the ALJ.  In fact, he discussed Plaintiff's MS diagnosis throughout the opinion, including the fact that various testing, including MRIs and EEGs, demonstrated that Plaintiff suffers from MS.  Plaintiff fails to demonstrate that the ALJ ignored evidence of his MS.

Plaintiff also points to a line of cases from this District and the Sixth Circuit that recognize the "waxing and waning nature of multiple sclerosis" to conclude that "the ability to perform work activity during periods of remission did not establish an ability to engage in substantial gainful activity." (DE 18 at 18, citing *Anderson v. Comm'r of Soc. Sec.*, 440 F. Supp. 2d 696, 699 (E.D. Mich. 2006)). However, Plaintiff's case is distinguishable. There is no indication here of the ALJ's finding that 1) Plaintiff was able to perform work during a period of remission or 2) that the ALJ actually factored such a thing into his analysis.

Furthermore, the ALJ followed the requirements of 20 C.F.R. § 404.1529 (c)(1-3) and provided a sufficiently specific explanation for his decision to

17

discount Plaintiff's credibility.  Specifically, the ALJ discussed Plaintiff's daily activities (R. at 79), the location, duration, frequency, and intensity of his pain (R. at 76 and 78), and the type, dosage, effectiveness, and side effects of his medication (R. at 79.).  He concluded that Plaintiff was not entirely credible for a variety of permissible reasons, including Plaintiff's relatively high GAF scores and the fact that his stated activities of daily living, including paying bills, vacuuming, taking out the trash, running errands, playing video games, and driving, among other things, were "not compatible with an individual who suffers from debilitating symptoms that would preclude all work."  (R. at 79.)  Accordingly, substantial evidence supports the ALJ's credibility finding and Plaintiff has failed to demonstrate that the ALJ erred in his assessment.

### 2.   Substantial Evidence Supports the ALJ's Weighing of Opinion Evidence

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 CFR §

404.1527(e)(2)(i).  The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.  Id.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements, specifically:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 404.1527).[4]  Furthermore, an ALJ must "always give good reasons in [the

---

[4] An exception exists for treating source opinions on issues that are reserved to the Commissioner, which "are never entitled to controlling weight or special significance."  S.S.R. 96-5p, 61 FR 34471-0, at *34473.  Examples of issues reserved to the Commissioner include:

ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

---

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
> 2. What an individual's RFC is;
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
> 4. How the vocational factors of age, education, and work experience apply; and
> 5. Whether an individual is "disabled" under the Act.

Id.

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Here, Plaintiff contends that the ALJ failed to give substantial deference to the treating source evidence, specifically, the opinions of Dr. Daryl Thompson, Plaintiff's treating neurologist, Lori Wheelhouse, M.A., LPC, Plaintiff's counselor, and Dr. Shahbaz Khan, Plaintiff's psychiatrist.  Defendant argues that the ALJ appropriately weighed the opinion evidence.  I will consider the ALJ's treatment of each medical provider in turn.

### a.     Dr. Daryl Thompson

The ALJ assigned "little weight" to Dr. Thompson's June 23, 2010 letter indicating that Plaintiff was unable to resume gainful employment due to his MS. (R. at 81.)  The ALJ noted that such an opinion was entitled to little weight because it was not supported by medically acceptable clinical and laboratory diagnostic techniques, was not consistent with substantial evidence in the record, and was inconsistent with Plaintiff's normal neurological exams.  He also noted that such an opinion was not entitled to special significance because it was on an issue reserved to the Commissioner.  Finally, the ALJ indicated that the opinion "has not been ignored."  (R. at 81.)

Plaintiff's main argument is that the ALJ was required to apply the treating physician rule, including the *Wilson* factors, to Dr. Thompson's opinion. While Plaintiff is correct that Dr. Thompson qualifies as Plaintiff's treating physician pursuant to 20 C.F.R. § 404.1502, his argument must ultimately fail. The ALJ was not required to follow the dictates of 20 C.F.R. § 404.1527(c), because Dr. Thompson's opinion that Plaintiff was unable to work is an issue reserved to the Commissioner and therefore not entitled to controlling weight or any special significance, even when opined by a treating physician. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007). To put it another way, an opinion that the patient is *unable to do work* is not the type of opinion for which the ALJ is required to afford controlling or special weight under the Regulations. Nevertheless, the ALJ also provided good reasons for discounting the opinion, noting that it was inconsistent with other evidence in the record, and with Plaintiff's normal neurological examinations. (R. at 81.) The ALJ's treatment of Dr. Thompson's opinion was sufficiently specific as to the reasons for the weight assigned and substantial evidence supports the ALJ's conclusions. (*See*, *e.g.*, R. at 497, 511, 591, and 681.) Accordingly, the ALJ did not err in his decision to afford the decision little weight, or in his articulation of the reasons why he discounted Dr. Thompson's opinion.

### b.      Lori Wheelhouse, M.A., LPC

On March 29, 2010, Plaintiff's counselor Lori Wheelhouse opined that he was unable to work due to his medical and mental health conditions.  The ALJ gave little weight to her opinion because it was not supported by medically acceptable clinical and laboratory diagnostic techniques, not consistent with other substantial evidence, and was not the opinion of an "acceptable medical source" pursuant to 20 C.F.R. 404.1513(a).  In addition, the ALJ noted that such an opinion is reserved to the Commissioner and therefore not entitled to special weight. Plaintiff takes issue with the ALJ's assertion that Ms. Wheelhouse was "not an acceptable medical source."  (DE 18 at 22.)  He points to S.S.R. 06-3p, which indicates that information from other sources "*may* provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  (Id.) (emphasis added).  The ALJ did note, however, that Ms. Wheelhouse "did not cite any specific examinations, diagnostic tests or objective medical findings" upon which her opinion was based.  (R. at 80.)  Accordingly, the only opinion the ALJ could evaluate was her opinion that Plaintiff was unable to work.  Once again, the ALJ appropriately discounted an opinion in an area reserved to the Commissioner and need not have provided any special weight or significance to Ms. Wheeler's opinion.  Moreover, I note that S.S.R. 06-3p contains permissive language, not a mandate.

23

### c.   Dr. Shahbaz Khan

The ALJ gave limited weight to Dr. Khan's opinion that Plaintiff was limited to low stress occupations and his symptoms precluded him from maintaining the persistence and pace to engage in competitive employment.  (R. at 81.)  The ALJ noted that Dr. Khan's opinion was not well-supported by medically acceptable clinical and laboratory techniques, and not consistent with substantial evidence in the record.  In addition, he noted that such an opinion was inconsistent with Dr. Khan's own treatment notes, which indicate that Plaintiff improved with treatment and had only mild to moderate limitations.  Plaintiff argues that this was in error because there are no opinions in the record to contradict Dr. Khan.  He also asserts that the ALJ did not give any reasons for ignoring the portions of Dr. Khan's opinion that Plaintiff could neither handle changes in a routine work setting,  nor complete a normal work day/week without interruptions.

Here, the ALJ provided good reasons for discounting the opinion, including inconsistency with the record as a whole and with Dr. Khan's own treatment notes. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." (quoting S.S.R. 96-2p, 1996 WL 374188, at *2)).

Substantial evidence supports this conclusion.  When Plaintiff began mental health treatment at Tri-County Mental Health Services, he was assessed with a GAF of 49.[5]  (R. at 787.)  Less than two months later, his GAF was assessed as 55-60, and has been consistently 55-65 since then.  (R. at 792, 797, 799, 803.)  Such assessments are consistent with Dr. Khan's own notes that Plaintiff improved with treatment.  Dr. Khan also consistently notes that Plaintiff was alert and oriented, able to focus, that his recent and remote memory was intact (R. at 796, 799, 803) and that his concentration was fair (R. at 799, 803).  Finally, the ALJ actually included Dr. Khan's limitations in his ultimate RFC by limiting Plaintiff to only superficial interaction with the public and routine interaction with supervisors and co-workers.  Accordingly, the ALJ provided good reasons for discounting Dr. Khan's opinion and substantial evidence in the record supports his conclusion.

The ALJ also complied with the *Wilson* requirements by providing dates associated with the treatment relationship, including the duration of the treatment relationship, which began on December 14, 2009.  (R. at 81.)  As addressed above, the ALJ spent a significant amount of time discussing the supportability of Dr. Khan's opinion with the record as a whole in determining what weight to assign to

---

[5] A GAF score of 41-50 is indicative of serious symptoms (e.g.. suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34.

the opinion.  Accordingly, the ALJ appropriately considered Dr. Khan's opinion under the regulations, and substantial evidence supports his conclusions.

### 3.    Substantial Evidence Supports the ALJ's Hypothetical Questions to the VE

When an ALJ concludes that a claimant does not have the RFC to perform his or her past relevant work, the burden shifts to the Commissioner to show that Plaintiff "possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This requires the Commissioner to "make a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal citations omitted).  Such substantial evidence "may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Id.*  "A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform." *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 927 (E.D. Mich. 2005).

Here, Plaintiff contends that the ALJ erred by failing to include Plaintiff's memory problems and reduced vision in his hypothetical questions to the VE. Defendant counters that the ALJ accounted for Plaintiff's issues with poor memory

26

by limiting him to unskilled and semi-skilled instructions and for Plaintiff's visual acuity issues by limiting him to no work at unprotected heights.  (DE 24 at 25.)

Plaintiff's argument fails for two reasons.  First, the ALJ incorporated Plaintiff's memory impairments into his hypothetical by limiting the hypothetical individual to one who can "understand, remember, and carry out *simple* instructions."  (R. at 116) (emphasis added.)  This is consistent with substantial evidence in the record.  For example, there is evidence that Plaintiff's concentration was fair and that his remote and recent memory was intact.  He was noted to have "good knowledge of current events and recall was 1/3 at 3 minutes, although he could remember [Dr. Sand's] name easily."[6]  (R. at 810.)  In addition, Plaintiff indicated that he pays his own bills, counts change, runs errands, plays video games, and works on puzzles, all of which indicate that Plaintiff is able to remember simple instructions.  (R. at 381-392.)  Accordingly, the hypothetical the ALJ posed to the VE regarding Plaintiff's memory problems was supported by substantial evidence.

---

[6] Neither party provides an explanation as to the medical significance of Plaintiff's ability to remember only one to two of three items over three to five minutes.  (*See* R. at 523 ("He only remembered one of three words after 5 minutes."), and 768 (noting that Plaintiff was "able to recall 2/3 objects for test of recall")).  However, there is persuasive case law on point concluding that a one out of three finding is not indicative of short-term or long-term memory impairment.  *See Scott v. Comm'r of Soc. Sec.*, No. 6:10-cv-1244-ORL-28, 2012 WL 834118, at *1 (M.D. Fla. Mar. 13, 2012).

Plaintiff seemingly did not account for Plaintiff's reduced left-eye vision in his hypothetical to the RFC and there is evidence of Plaintiff's left-eye problems in the record.  Consultative examiner Dr. Sand noted that Plaintiff's uncorrected visual acuity was 20/25 in his right eye and 20/200 in his left eye, which he assessed as "reduced visual acuity in [Plaintiff's] left eye.  (R. at 810.)  However, Plaintiff indicated that he watched television and movies, played video games, and used a computer to look at the internet.  (DE 383-387.)  It is unclear, and Plaintiff does not point out, what additional restrictions the ALJ should have included in his hypothetical regarding Plaintiff's reduced visual acuity.  Nor did Plaintiff testify about his reduced visual acuity at the hearing.  *See, e.g., Griffith v. Comm'r of Soc. Sec.*, No. Civ. A. 12-10579, 2014 WL 1213257, at *19 (E.D. Mich. Feb. 14, 2014) *report and recommendation adopted*, No. 12-15079, 2014 WL 1224807 (E.D. Mich. Mar. 24, 2014) (noting that Plaintiff's failure to testify about the limiting effects of his impairment was evidence to support the ALJ's limited consideration). Moreover, Defendant is correct in pointing out that by restricting Plaintiff from work at unprotected heights, it is apparent that the ALJ took Plaintiff's visual acuity into consideration.  Plaintiff has failed to show that the ALJ's hypothetical to the VE was in error.

## G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: June 10, 2015                  s/Anthony P. Patti
                                      Anthony P. Patti
                                      UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record
on June 10, 2015, electronically and/or by U.S. Mail.

                                      s/Michael Williams
                                      Case Manager for the
                                      Honorable Anthony P. Patti

30